62 February 16, 2017 No. 9

IN THE SUPREME COURT OF THE
STATE OF OREGON

Stephanie M. DOWELL,
individually and
on behalf of others similarly situated,
*Petitioner on Review,*

*v.*

OREGON MUTUAL INSURANCE COMPANY,
an Oregon corporation,
*Respondent on Review.*

(CC 1205-06486; CA A153170; SC S063079)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 8, 2016.

Charles Robinowitz, Law Offices of Charles Robinowitz, Portland, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Genavee Stokes-Avery.

Thomas M. Christ, Cosgrave Vergeer Kester LLP, Portland, argued the cause and filed the briefs for respondent on review.

Hadley Van Vactor, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

NAKAMOTO, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

Walters, J., dissented and filed an opinion, in which Baldwin, J., and Brewer, J., joined.

_____
\* Appeal from Multnomah County Circuit Court, Henry C. Breithaupt, Judge Pro Tempore. 268 Or App 672, 343 P3d 283 (2015).

**NAKAMOTO, J.**

Auto insurers in Oregon must provide personal injury protection (PIP) benefits to their insureds for certain automotive injury-related expenses, regardless of who is at fault in an accident. ORS 742.520(1). The PIP medical benefits at issue in this case "consist of the following payments for the injury or death of each person" covered: "All reasonable and necessary expenses of medical, hospital, dental, surgical, ambulance and prosthetic services incurred within one year after the date of the person's injury, but not more than $15,000 in the aggregate for all such expenses of the person." ORS 742.524(1)(a) (2007).[1] On behalf of herself and others similarly situated, plaintiff contended in her action against defendant Oregon Mutual Insurance Company that insurers must pay transportation costs incurred to obtain medical care as part of PIP medical benefits. The trial court concluded that the PIP statutes, ORS 742.518 to 742.542, do not require insurers to pay for transportation costs and granted summary judgment for defendant. Plaintiff appealed, and the Court of Appeals affirmed. *Dowell v. Oregon Mutual Ins. Co.*, 268 Or App 672, 343 P3d 283 (2015).

The question on review is whether the PIP medical benefit in ORS 742.524(1)(a) includes the insured plaintiff's transportation costs to receive medical care. We hold that PIP benefits for the "expenses of medical *** services" do not include an insured's transportation costs for traveling to receive medical care. Therefore, we affirm the decision of the Court of Appeals and the judgment of the trial court.

## I.   BACKGROUND

The relevant facts are not in dispute. Plaintiff had an Oregon auto insurance policy issued by defendant. In 2008, plaintiff was injured in a motor vehicle accident.

---

[1] In 2009, the legislature amended ORS 742.524(1)(a), but those amendments apply only to policies issued or renewed after the January 1, 2010, effective date. Or Laws 2009, ch 66, §§ 1, 3. The legislature again amended the statute in 2015, but those amendments apply only to policies issued or renewed after the January 1, 2016, effective date. Or Laws 2015, ch 5, §§ 4, 7. Because this case involves a pre-2010 policy, those 2009 and 2015 amendments do not apply. For that reason, all the citations in this opinion are to the 2007 version of the relevant statutes, except where otherwise noted.

Among other expenses, plaintiff incurred $430.67 in transportation costs to attend medical appointments and to obtain medication. She then applied for PIP medical benefits under her insurance policy. Defendant paid for plaintiff's medical care, but it declined to pay for her transportation expenses to obtain her medical care.

Plaintiff then filed a complaint for breach of contract, both for herself and on behalf of others similarly situated. She alleged that her claim for medical expenses under ORS 742.524(1)(a) included her transportation costs and that defendant had breached its contract by failing to reimburse her for those expenses. Defendant responded by moving for summary judgment, arguing that ORS 742.524(1)(a) did not require it to pay for transportation costs. After a hearing, the trial court granted defendant's motion and entered a judgment in defendant's favor.

On appeal, the Court of Appeals narrowed the case to a single question: Does the phrase "expenses of medical * * * services" in ORS 742.524(1)(a) require an insurer to pay an insured's expenses for transportation to attend medical appointments and to obtain medication? *Dowell*, 268 Or App at 675.[2] The Court of Appeals answered that question by considering the statute's text and context.[3] After examining dictionary definitions of the four words in the phrase "expenses of medical * * * services," the Court of Appeals concluded that, considered as a whole, the phrase meant "something that is expended to secure a benefit relating to work that is performed by another, when that work involves the practice of medicine (the maintenance of health, and the prevention, alleviation, or cure of disease)." *Id.* at 677. After considering the phrase's context, particularly the remaining text of the statute and other PIP provisions pertaining to payments to "providers" of medical services, the Court of

---

[2] In their briefs before the Court of Appeals, the parties referred to the actual auto policy underlying this matter, which they described as essentially mirroring the text of ORS 742.524(1)(a). That policy, however, is not part of the appellate record, and the resolution of this case does not depend on it. Because the wording of the policy and the statute are the same, this case focuses on the proper interpretation of ORS 742.524(1)(a), not the wording of a policy that might arguably provide a PIP benefit more generous than the one that is statutorily required.

[3] Neither party presented any legislative history to the court.

Appeals concluded that the legislature had not intended the statute to include expenses of transportation to obtain medical services. 268 Or App at 677-78.

We allowed plaintiff's petition for review to address the interpretation of ORS 742.524(1)(a). On review, plaintiff contends that two statutes, ORS 731.008 and ORS 731.016, serve as the starting point for construing the phrase "expenses of medical *** services." According to plaintiff, the legislature's declarations in those two statutes require us to liberally construe ORS 742.524(1)(a), and, read in that light, the phrase at issue should be understood as a reference to "the costs to obtain medical services," including the costs for transportation to a doctor's office or hospital to obtain medical advice and treatment. Consequently, plaintiff asserts that transportation costs to obtain medical services qualify as PIP benefits.

Second, plaintiff argues that the Court of Appeals decision conflicts with the purpose and policy of the PIP statutes, which is to reduce litigation and to ensure prompt payment of claims. Because health care is not available without traveling to a doctor or hospital, plaintiff argues, those travel costs are especially burdensome to rural residents who may have to travel a significant distance. Plaintiff also asserts that the reasoning of the Court of Appeals will encourage insurance companies to deny injured persons payment for medication, medical supplies, and medical equipment.

Finally, plaintiff contends that sources of law outside the PIP statutes are persuasive authority in favor of her interpretation of the statute. She relies on decisions from courts in other jurisdictions that have held that the PIP benefits in those jurisdictions include the reasonable cost of travel to a health care provider.

Defendant responds that the text and context of the statute limit payment to the cost of services expressly listed in ORS 742.524(1)(a) that are performed by a "provider," that is, a licensed healthcare provider. Noting that the statute refers only to ambulance services and not to other transportation, and that it contains a presumption concerning payments for healthcare providers, defendant argues that PIP benefits are not meant to cover "providers of *non*-health

care services," such as a taxicab or bus service, or services that insureds perform for themselves, such as driving to the doctor's office. (Emphasis in original.) Defendant also contends that the out-of-state authorities cited by plaintiff are not helpful because of differences in the relevant statutes and case law.

Our measure of legislative intent takes into account the legislative history of the PIP benefit statute, in addition to its text and context. As explained below, we ultimately conclude that the Oregon Legislative Assembly did not intend to include the expenses of transportation to obtain medical services as a PIP medical benefit in ORS 742.524(1)(a), but we arrive at that conclusion after rejecting both parties' rationales for their divergent readings of ORS 742.524(1)(a).

## II.   ANALYSIS

The issue presented involves statutory construction, which we resolve by applying familiar principles set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). To discern the meaning of the statute most likely intended by the legislature that enacted it, we examine the text and context of the statute and, where appropriate, legislative history and pertinent canons of construction. *State v. Walker*, 356 Or 4, 13, 333 P3d 316 (2014); *Gaines*, 346 Or at 171-72.

### A.   *Oregon's PIP Statutory Scheme*

To aid our discussion, we begin with a brief overview of the PIP statutory scheme. PIP is a form of no-fault insurance mandated by Oregon law to be included in any motor vehicle liability policy. ORS 742.520(1). PIP coverage is governed by ORS 742.518 to 742.544. PIP benefits "consist of payments for expenses, loss of income and loss of essential services as provided in ORS 742.524." ORS 742.520(3).

An insurer must pay PIP benefits "promptly after proof of loss has been submitted to the insurer." ORS 742.520(4). We have explained that "the obvious purpose of [the PIP statutes] is to provide, promptly and without regard to fault, reimbursement for *some* out-of-pocket losses resulting from motor vehicle accidents." *Perez v. State Farm*

*Mutual Ins. Co.*, 289 Or 295, 300, 613 P2d 32 (1980) (emphasis added). Indeed, since their creation, in general, PIP benefits have consisted of payments for "medical expenses and loss of income." *Kessler v. Weigandt*, 299 Or 38, 40 n 3, 699 P2d 183 (1985) (discussing the predecessors of ORS 742.520 and ORS 742.524, namely, *former* ORS 743.800, *renumbered as* ORS 742.520 (1989), and *former* ORS 743.805, *renumbered as* ORS 742.524 (1989)).

This case involves the PIP medical benefit in ORS 742.524(1)(a), which requires payment for

"[a]ll reasonable and necessary expenses of medical, hospital, dental, surgical, ambulance and prosthetic services incurred within one year after the date of the person's injury, but not more than $15,000 in the aggregate for all such expenses of the person."

That statute also contains a presumption that expenses of medical and other listed services claimed by a "provider" on behalf of an insured are reasonable and necessary, unless the insurer timely denies the claim:

"Expenses of medical *** services shall be presumed to be reasonable and necessary unless the provider is given notice of denial of the charges not more than 60 calendar days after the insurer receives from the provider notice of the claim for the services."

*Id.*

The term "provider" is statutorily defined. ORS 742.518(10) (stating that "provider" has the meaning given to that term in ORS 743.801). As used in the presumption described in ORS 742.524(1)(a), a "provider" is "a person licensed, certified or otherwise authorized or permitted by laws of this state to administer medical or mental health services in the ordinary course of business or practice of a profession." ORS 743.801(13). A number of other provisions in the PIP statutes refer to payments to providers. *See, e.g.*, ORS 742.525, ORS 742.528.

An insurer may deny a PIP claim for medical expenses; however, the "potential existence of a cause of action in tort does not relieve an insurer from the duty to pay [PIP] benefits." ORS 742.520(5). Disputes over PIP

payments may be adjudicated in either of two forums. If the parties mutually agree, they can use binding arbitration. ORS 742.520(6).[4] Or, like plaintiff, an insured who contends that the insurer wrongly denied PIP benefits may choose to file a civil action against the insurer.

B. *Text and Context of ORS 742.524(1)(a)*

With that overview, we turn to construe ORS 742.524(1)(a). We begin with the text of the statute. *Sanders v. Oregon Pacific States Ins. Co.*, 314 Or 521, 527, 840 P2d 87 (1992). The phrase directly at issue contains four terms: "expenses," "of," "medical," and "services." In construing those terms, we pay careful attention to "the exact wording of the statute." *State v. Vasquez-Rubio*, 323 Or 275, 280, 917 P2d 494 (1996). That is because the text provides the best evidence of the legislature's intent and the starting point for our analysis. *PGE*, 317 Or at 611; *see also Whipple v. Howser*, 291 Or 475, 480, 632 P2d 782 (1981) (stating that there is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes").

None of the statutory terms set out above are defined by statute, nor are they legal terms of art. Therefore, our task is to determine the intended meaning of those words, applying the ordinary tools of statutory construction. When the legislature has not defined a word or a phrase, we assume, at least initially, that the word or phrase has its "plain, natural, and ordinary" meaning. *PGE*, 317 Or at 611; *accord Wright v. Turner*, 354 Or 815, 827, 322 P3d 476 (2014). This court frequently consults dictionary definitions in such cases on the assumption that, if the legislature did not provide a specialized definition for a term, the dictionary will help to shed light on its meaning as intended by the legislature. *State v. Murray*, 340 Or 599, 604, 136 P3d 10 (2006).

---

[4] ORS 742.520(6) provides, in part:

"Disputes between insurers and beneficiaries about the amount of personal injury protection benefits, or about the denial of personal injury protection benefits, shall be decided by arbitration if mutually agreed to at the time of the dispute."

The dictionary definition of "expense" is straight-forward. "Expense" means "**2 a :** something that is expended in order to secure a benefit or bring about a result" or "**b :** the financial burden involved typically in a course of action or manner of living **:** cost." *Webster's Third Int'l Dictionary* 800 (unabridged ed 2002) (boldface in original). Thus, in ordinary usage, the word "expenses" means something that is expended, a cost, to secure a benefit or bring about a result.

In part, *Webster's* defines "of" to mean "**5 b :** from as the place of birth, production, or distribution **:** having as its base of operation, point of initiation, or source of issuance or derivation." *Id.* at 1565. That definition appears to suggest a derivation that is not necessarily geographical, but, if the dissent is correct that the definition has only a "locational meaning." *Dowell*, 361 Or at __ (Walters, J., dissenting), other definitions point in a similar direction. For example, "of" is also defined as being "**6**—used as a function word to indicate the cause, motive, or reason by which a person or thing is actuated or impelled" or "**15**—used as a function word to indicate a quality or possession characterizing or distinguishing a subject." *Id.* More broadly, though, "of" is defined as "**11 :** relating to **:** with reference to **:** as regards **:** ABOUT." *Id.* Although there are many other definitions, none comes as close as the foregoing to address the problem before us.

The word "medical" has two possible definitions in this context. "Medical" means "**1 :** of, relating to, or concerned with physicians or with the practice of medicine often as distinguished from surgery" or "**2 :** requiring or devoted to medical treatment *** — distinguished from *surgical*." *Webster's* at 1402 (emphasis in original).

Finally, the noun "service" also is defined in many ways. But in this case, the applicable definitions of "service" are either "**2 :** the performance of work commanded or paid for by another" or "**9 a :** action or use that furthers some end or purpose **:** conduct or performance that assists or benefits someone or something **:** deeds useful or instrumental toward some object." *Webster's* at 2075.

In light of those definitions, the phrase "expenses of medical *** services" can, as a textual matter, plausibly be

read in different ways. Each of the parties offers a different understanding of the phrase, but we conclude that there is a third plausible reading.

In the strictest reading, which defendant urges, the PIP expenses authorized for "medical *** services" are the costs for the professional work performed by a physician or other person who renders medical care. Plaintiff objects that defendant and the Court of Appeals have focused too narrowly on "services," which omits from PIP benefits a variety of nonservice medical costs that are necessary adjuncts of medical treatment, including medications and other medical supplies and equipment, such as bandages and crutches.

By relying on the broader meaning of the word "of," plaintiff offers the most expansive view of the phrase "expenses of medical *** services." In plaintiff's view, that phrase refers to a cost that is related in some way to work that involves medical care or the practice of medicine. In accordance with that view, plaintiff contends that transportation to receive medical care is "related" to the benefit of work performed by a healthcare provider because, as a practical matter, transportation usually is needed for the injured person to obtain medical treatment. Defendant disagrees, arguing that transportation costs—other than ambulance services—are not "related" to medical care and instead are ancillary.

In our view, however, there is a third reading of the phrase that neither party proffers. In it, the dictionary definitions point to costs that have as their source or derivation an action or use that is devoted or instrumental to medical treatment. In other words, "expenses of medical *** services," ORS 742.524(1)(a), can refer to costs that originate with the rendered medical treatment or the physician's performance of work. That meaning of the phrase is consistent with PIP benefit coverage for items such as medications or crutches that injured individuals use as part of their medical treatment.

In light of those alternatives, the text alone does not provide a definitive answer regarding what the legislature intended in ORS 742.524(1)(a). But of course, we do not interpret a statutory phrase solely on the basis of dictionary

definitions. *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011). Statutory construction in Oregon requires an examination of word usage in context to determine what the legislature most likely intended. *See, e.g.*, *State v. Fries*, 344 Or 541, 546-50, 185 P3d 453 (2008) (considering context to determine which of multiple definitions was intended by the legislature).

We begin with plaintiff's contextual argument. She argues that we are required by general provisions in the Insurance Code to liberally interpret insurance law in favor of insureds. Plaintiff relies on ORS 731.016, which provides:

> "The Insurance Code shall be liberally construed and shall be administered and enforced by the Director of the Department of Consumer and Business Services to give effect to the policy stated in ORS 731.008."

The policy referred to in ORS 731.016 states that "the Insurance Code is for the protection of the insurance-buying public." ORS 731.008. Plaintiff and *amicus curiae* Oregon Trial Lawyers Association further contend that, under *Carrigan v. State Farm Mutual Auto. Ins. Co.*, 326 Or 97, 104-05, 949 P2d 705 (1997), the declaration in ORS 731.016 is a command to courts construing the Insurance Code.

We agree that both ORS 731.008 and ORS 731.016 are statutes that are related to, and function as, context for ORS 742.524(1)(a), which is part of the Insurance Code. Nevertheless, we reject plaintiff's argument that those statutes, coupled with our decision in *Carrigan*, require us to liberally construe the PIP statute at issue in her favor.

In large part, plaintiff's argument depends on overreading *Carrigan*, which was decided at a time when Oregon courts followed a strict analytical framework for statutory interpretation that proceeded in stages, as prescribed by *PGE*, 317 Or 606. The court in *Carrigan* summarized that framework:

> "In construing a statute, this court's task is to discern the intent of the legislature. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). To discern legislative intent, this court first looks to the text and context of the statute. *Id*. at 610-11, 859 P2d 1143. If the intent of the legislature is clear from text and context, we

proceed no further. *Id*. at 611, 859 P2d 1143. If the text and context do not make the legislature's intent clear, we then inquire into legislative history. *Id*. at 611-12, 859 P2d 1143. Finally, if the legislative history, coupled with text and context, still provides no clear answer, we then turn to legal maxims. *Id*. at 612, 859 P2d 1143.

326 Or at 101. In *Carrigan*, we adopted a liberal construction of ORS 742.520(2)(a) (1997)—but only at the last stage of that analytical framework set out above: the application of "maxims of statutory construction." 326 Or at 104. Because the text and context of the PIP statute at issue in *Carrigan*, together with its legislative history, were not dispositive, we resorted to a maxim of statutory construction suggested by the statutory interpretive directive in ORS 731.016: a rule of "liberal construction" to further the protection of the insurance-buying public in insurance cases. *Carrigan*, 326 Or at 104-105; *see also Pierce v. Allstate Ins. Co.*, 316 Or 31, 38-39, 848 P2d 1197 (1993) (acknowledging a rule of "liberal construction" as a general maxim of statutory construction in insurance cases). *Carrigan*, therefore, does not control our analysis of the context of ORS 742.524(1)(a), and in this case, we need not employ a "liberal construction" rule as a maxim of statutory construction.[5]

In this case, the context of the disputed phrase undercuts plaintiff's proffered reading of ORS 742.524(1)(a). The first problem with plaintiff's reading of the phrase is the fact that ORS 742.524(1)(a) specifically mentions one kind of transportation service for which insurers must make payment: "ambulance" services. "Ambulance" is not defined in the PIP or insurance statutes. However, ambulance services are regulated in Oregon, as described in ORS chapter 682. In that chapter, the legislature defines an "ambulance"

---

[5] Countering plaintiff's proposed rule of liberal construction, defendant argues that, by its terms, the statute on which it is based, ORS 731.016, appears to instruct the Director of the Department of Consumer and Business Services, not the courts, to liberally construe the Insurance Code when promulgating agency rules and to administer and enforce that code to protect of the insurance-buying public. Defendant further argues that application of the PIP statutes in favor of injured insureds like plaintiff does not necessarily advance the legislature's stated policy of protecting the insurance-buying public, which includes all Oregon drivers who are required to purchase auto insurance. We need not delve into the origin, validity, and effect of the "liberal construction" maxim of statutory construction, because we need not apply it in this case.

as a vehicle "that is regularly provided for the emergency transportation of persons who are ill or injured or who have disabilities." ORS 682.025(1). Accordingly, the legislature expressly required PIP benefits to include payment for the cost of specialized medical transportation, along the lines of the other listed medical and dental care described in the PIP benefit in ORS 742.524(1)(a). Subsection (1)(a) of the PIP benefits statute, however, does not include payment more broadly for "transportation" services, when the legislature could have easily done so by including ordinary transportation as a covered expense.

Other than her more general argument that courts should read the PIP statutes in an insured's favor, plaintiff does not have a response to the specific inclusion of ambulance services and the absence of general transportation services in the list of statutorily mandated medical benefits in ORS 742.524(1)(a). In light of that context, we are not persuaded by the argument that ORS 731.008 and ORS 731.016 change the contextual analysis of the statute by favoring injured parties covered by an auto policy, whether or not ORS 731.008 and ORS 731.016 form legislative instructions for courts—as opposed to the Director of the Department of Consumer and Business Services—as the courts construe provisions in the Insurance Code.

Looking at the statute as a whole, we see yet another problem for the broad reading advanced by plaintiff, given ORS 742.524(1)(e). That statute provides that child care is to be paid as a PIP benefit in limited circumstances, when persons with injuries serious enough to require a 24-hour hospital admission are unable to work:

"If the injured person is a parent of a minor child and is required to be hospitalized for a minimum of 24 hours, $25 per day for child care, with payments to begin after the initial 24 hours of hospitalization and to be made for as long as the person is unable to return to work if the person is engaged in a remunerative occupation or for as long as the person is unable to perform essential services that the person would have performed without income if the person is not usually engaged in a remunerative occupation, but not to exceed $750."

If plaintiff's broad reading of the phrase "expenses of medical * * * services" is correct, then *all* expenses that an injured person incurs to actually obtain medical care—whether transportation costs or, for example, child care costs for trips to the doctor and physical therapy—are mandated PIP benefits. Subsection (1)(e) of ORS 742.524, however, does not state that the child care PIP benefits described above are different from or to be paid in addition to any other actual child care expenses incurred to receive medical services. Thus, ORS 742.524(1)(e) casts additional doubt on plaintiff's proposed construction of ORS 742.524(1)(a).[6]

At the same time, we remain unconvinced that context supports defendant's opposing view of the statute. As mentioned, the statute contains a presumption providing that "[e]xpenses of medical * * * services are presumed to be reasonable and necessary unless the provider receives notice of denial of the charges not more than 60 calendar days after the insurer receives from the provider notice of the claim for the *services*." ORS 742.524(1)(a) (emphasis added). And, in *Ivanov v. Farmers Ins. Co.*, 344 Or 421, 429, 185 P3d 417 (2008), we recognized that the "reasonable and necessary" presumption applies when "a *healthcare provider* submits a PIP claim for medical expenses on behalf of an insured." (Emphasis added.) No parallel presumption exists for non-healthcare providers in ORS 742.524(1)(a). As a result, defendant draws the conclusion that the "reasonable and necessary" presumption is designed to cover what it views to be the universe of PIP medical benefit claims, namely, claims for professional services by healthcare providers. Defendant further argues that other PIP statutes that refer to "providers" supply evidence for that conclusion as well, citing ORS 742.525(1)(b). That statute states that a healthcare provider cannot charge more than the amount in "fee

---

[6] The dissent supports plaintiff's argument, suggesting that, by using the word "all" in the phrase "*all* reasonable and necessary" costs of the listed medical services, the legislature meant to include all expenses in some way related to obtaining medical care, including transportation. *Dowell*, 361 Or at ___ (Walters, J., dissenting). The word "all," however, modifies "reasonable and necessary"; therefore, the statute requires that, for any covered medical care that qualifies as a covered PIP benefit, an insurer must pay the expense or cost of the care if it was reasonable and necessary. The term does not clarify whether the legislature meant to include transportation as a medical benefit.

schedules for medical services" published by the Director of the Department of Consumer and Business Services pursuant to ORS 656.248.[7]

We conclude, however, that the presumption and the procedures for claims by healthcare providers manifest the legislature's decision to address the claims process for healthcare providers in the PIP statutes and not a limitation on the scope of PIP medical benefits. It is apparent from the PIP statutory scheme that the legislature has not enacted presumptions or detailed procedures designed to manage how insurers calculate amounts that they must pay for all mandated PIP benefits and resulting disputes regarding those amounts. For example, PIP benefits include loss of income for those usually engaged in a remunerative occupation, ORS 742.542(1)(b), and loss of essential services for those who are not usually engaged in a remunerative occupation, ORS 742.542(1)(c). Yet those provisions of the benefits statute do not include any presumptions that might limit a variety of conceivable disputes that could occur between the injured person and the insurer regarding amounts that must be paid for losses. Thus, although the presumption for payments to healthcare providers was designed to reduce disputes over medical bills,[8] there simply is no similar

---

[7] Several other PIP statutes also address procedures relating to payments to healthcare providers. Under ORS 742.528(1), the procedure for denying payment requires notice to an insured within the same window of time permitted for denials of healthcare provider claims: the insurer must provide "written notice of the denial, within 60 calendar days of receiving a claim from the provider, to the insured[.]" And if the insurer receives a claim by a healthcare provider, the insurer must timely provide "a copy of the notice of the denial *** to a provider of services under ORS 742.524(1)(a)." ORS 742.528(2). Additionally, ORS 742.529 allows an insurer to seek reimbursement from healthcare providers. If an insurer pays PIP benefits "based on information that appeared to establish proof of loss and the insurer paying the benefits later determines" that it was not responsible for the payment, "the insurer shall give notice and explanation to the provider that the payment was incorrectly issued. Immediately after receiving the notice and explanation the provider shall promptly repay the insurer." ORS 742.529.

[8] The presumption was added to the statute in 1987. As the testimony of one of the opponents of the presumption indicates, the presumption was designed to induce prompt payment of medical bills. At a public hearing for House Bill (HB) 2443 before the Senate Business, Housing and Finance Committee, a manager for a medical cost containment company read from prepared testimony in opposition to HB 2443. She contended that "[t]he wording in [HB] 2443 would prohibit insurers identifying accuracy and utilization issues in medical bills." Exhibit K, Senate Business, Housing and Finance Committee, May 12, 1987 (accompanying statement of Faye Stump).

presumption in place for any other "expenses of medical \*\*\* services" that an injured person may claim. In other words, the absence of presumptions for mandated PIP benefits is not anomalous in the PIP statutory scheme.

That leaves the third meaning suggested by the text of the phrase "expenses of medical \*\*\* services": costs that originate with, or that are actuated by, the rendered medical treatment or the physician's performance of work. Such costs would include the medications and medical supplies and equipment that a physician prescribes for treatment of the injured person. None of the relevant context discussed above contradicts that reading, and that reading is supported by legislative history.

C.   *Legislative History*

Neither party urges us to consider the legislative history of ORS 742.524(1)(a) to support their differing views of the statute. But, as we have done in numerous cases, we review the legislative history to determine whether the statute contains any latent ambiguity overlooked in our "plain meaning" analysis. *See, e.g.*, *Ware v. Hall*, 342 Or 444, 452 n 6, 154 P3d 118 (2007) ("[t]o the extent that text and context le[ft] any doubt about the legislature's intent, the legislative history remove[d] it"). We review pertinent legislative history, bearing in mind that "an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment." *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 539 n 4, 888 P2d 544 (1995) (Graber, J., dissenting).

The origin and development of ORS 742.524(1)(a) is a bit cluttered due to the renumbering of statutes, but demonstrates that the phrase at issue, "expenses of medical \*\*\* services," is essentially unchanged in form since the original PIP legislation was enacted. In 1971, the legislature enacted House Bill (HB) 1300, which incorporated the PIP benefits provision. Or Laws 1971, ch 523, § 2. The benefits provision in section 2 of the bill was codified as *former* ORS 743.800, and the phrase currently found in ORS 742.524(1)(a) was written as "expenses *for* medical \*\*\* services." (Emphasis added.) In 1981, the benefits provision was moved to *former* ORS 743.805, Or Laws 1981, ch 414, § 2,

and the phrase was changed to its current form, with "of" replacing "for."[9] In 1987, *former* ORS 743.805 was amended to include the presumption discussed above. Or Laws 1987, ch 588, § 2. And, finally, in 1989, *former* ORS 743.805 was renumbered as ORS 742.524.

At their inception in 1971, PIP benefits were directed toward prompt payment of two types of major expenses: medical costs and replacement of loss of income (or cost of essential services for those not employed in a remunerative occupation). As introduced, HB 1300 proposed the creation of PIP benefits and procedures for obtaining those benefits. During consideration of the bill, Insurance Commissioner Bateson, a proponent, and others testified. In his presentation to the Subcommittee on Financial Affairs of the House State and Federal Affairs Committee, Commissioner Bateson explained the purpose of the bill:

> "This bill is designed to meet the problem of speed and certainty of payment of medical costs and loss of wages as a result of personal injuries sustained in auto accidents."

Exhibit C, Subcommittee on Financial Affairs, House State and Federal Affairs Committee, HB 1300, Feb 24, 1971 (accompanying statement of Insurance Commissioner Cornelius Bateson). He elaborated on section 2 of the bill, which described PIP benefits of "up to $3,000 of medical payment" and "85% of wage loss for 1 year after a 14-day waiting period" or "cost of essential services provided by a person who is not normally engaged in a remunerative occupation for 1 year after a 14-day waiting period." *Id.*

In a separate written statement, Bateson described his creation of "a special advisory committee on auto insurance." Exhibit E, Subcommittee on Financial Affairs, House State and Federal Affairs Committee, HB 1300, Feb 24,

---

[9] The change in the words from "for" to "of" might prompt a question as to whether the legislature intended to change the scope of covered expenses. The parties agree that the wording change does not appear to have been intended as meaningful, and we are not aware of any legislative history to the contrary. Although the dissent views the term "for" as having a broad meaning that is consistent with the broad meaning of the term "of" that the dissent advances, *Dowell*, 361 Or at __ (Walters, J., dissenting), "for" can also mean "because of" or "on account of," *Webster's* at 886, which is consistent with our reading of the term "of" in the statute.

1971 (accompanying statement of Commissioner Bateson). According to Bateson, that committee met frequently throughout 1970, and it "considered the problems of automobile insurance in Oregon, considered a number of possible solutions and prepared recommended legislation which [was] submitted to the 1971 Legislature." *Id*. The committee reached several conclusions, including:

> "3)   That speed of payment of a claim is often as important as whether or not it is paid at all. Prolonged adjustment procedures during which the injured party is without wages or wage replacement, during which hospital, doctor or repair bills go unpaid.
>
> "* * * That bill is HB 1299.
>
> "4)   That * * * there are still many people whose coverage for economic loss sustained in auto accidents is less than adequate.
>
> "Loss of wages and medical bills is the major source of such economic losses. While a majority of auto policies provide 'Med-pay' coverage, wage loss coverage is rare as a first party auto coverage. Therefore the committee has prepared a bill which provides for the mandatory inclusion of $3,000 of medical payments and 85% of actual wage loss for one year (subject to certain limitations) in each insurance policy which covers a private passenger automobile. This bill is HB 1300."

*Id*.

At that same hearing, Ulrich, Underwriting Superintendent of State Farm Insurance Companies and President of the Automobile Plan of Oregon, also testified, reading a one-page statement. In that statement, Ulrich agreed "with the basic desirability of including medical payments coverage and loss of income benefits in policies carried by Oregon motorists." Exhibit D, Subcommittee on Financial Affairs, House State and Federal Affairs Committee, HB 1300, Feb 24, 1971 (accompanying statement of Paul Ulrich). Ulrich also raised another theme of the hearing: concerns over the costs. Ulrich stated that the proposed coverage "will certainly increase the cost of auto insurance by a substantial amount. In some cases, the increase will affect motorists who neither need nor want

the coverage because other coverage is carried." *Id*. The concern over costs and the effect that the law would have on low-income Oregonians who had to purchase auto insurance was shared by Representative Howard at an April 14, 1971, hearing before the House State and Federal Affairs Full Committee and by Representative Stathos at a May 3, 1971, hearing before the same committee. Minutes, House State and Federal Affairs Full Committee, Apr 14, 1971, 1; Minutes, House State and Federal Affairs Full Committee, May 3, 1971, 2.[10]

At a Senate Judiciary Committee hearing on May 19, 1971, Commissioner Bateson explained HB 1300 much as he had done in the earlier subcommittee meeting, although, by that time, the limits placed on the amounts of PIP benefits for wage loss had been reduced. Bateson also addressed the committee's concern with premium costs. Tape Recording, Senate Judiciary Committee, HB 1300, May 19, 1971, Tape 10, Side 2 (statement of Commissioner Bateson). Smith, a member of the Commissioner's Advisory Committee, testified that HB 1300 would solve some problems, including delayed payments and insured motorists not receiving some form of indemnity when injured. Tape Recording, Senate Judiciary Committee, HB 1300, May 19, 1971, Tape 10, Side 2 (statement of Edwin E. Smith). Another problem that HB 1300 would solve, added Smith, would be a reduction in litigation, particularly concerning smaller claims, because HB 1300 would ensure that an individual's wages and medical bills would be paid, thereby reducing the incentive to sue. *Id*.

Thus, the legislative history available to us from 1971 does not indicate that the legislature was concerned with delayed payments to injured motorists for their transportation costs to receive medical care. Instead, that history demonstrates that the legislation leading to ORS 742.524(1)(a) was introduced to encourage prompt payment of two major types of losses for injured motorists, namely, medical costs and lost wages, a conclusion underscored by the testimony

---

[10] Although it is not our usual practice to cite legislative committee minutes as authority for the discussion of the bill that took place in the committee, in this case, we must make an exception. We do so because the Oregon State Archives has "not received tapes of the Full Committee except for a few meetings in June."

of Insurance Commissioner Bateson and other insurance industry and advisory committee witnesses.

We are not persuaded by plaintiff's argument that a failure to read ORS 742.524(1)(a) to include an insured's transportation expenses incurred for traveling to and from medical providers would frustrate the legislative policy of ensuring prompt reimbursements for an injured person's expenses and thereby reducing litigation between drivers. We reject plaintiff's suggestion that the purpose of PIP benefits is to "provide for broader, not more restrictive, coverage." That proposition may be supported by Colorado law, which plaintiff cites as authority, but there is nothing in the legislative history of ORS 742.524(1)(a) that suggests that the legislature's purpose in enacting the PIP benefits statute was to fully compensate injured motorists on a no-fault basis.

In summary, although the legislative history is not as detailed as it could be, the evidence available indicates that the legislative committees considering HB 1300 understood that the rationale for the legislation included reducing litigation while maintaining reasonable insurance premiums. Both legislators and the insurance industry voiced concerns about the effect of PIP benefits on increases in premiums for auto insurance. And, specifically as to the medical PIP benefits, the discussion in legislative committee hearings in 1971, concerning "medical bills," "medical payments," and "medical expenses," focused on medical care. The descriptions of what the PIP medical benefit was intended to cover were not limited to healthcare providers' services; instead, they more broadly described the medical benefit.

Thus, the legislative history is consistent with our reading of the phrase "expenses of medical *** services" in ORS 742.524(1)(a) as including (1) the cost of professional services provided by licensed or certified healthcare providers and (2) medications and medical supplies and equipment that they have prescribed for the injured motorists that they treat. Accordingly, we agree with the trial court and the Court of Appeals that the legislature did not intend transportation costs for medical care to be a benefit under the PIP statutes.

D.   *Out-of-State Cases*

Plaintiff nevertheless contends that four out-of-state cases are persuasive authority for a contrary interpretation of ORS 742.524(1)(a). Plaintiff correctly notes that courts in other jurisdictions have held that transportation expenses to and from healthcare providers are compensable under their relevant state's PIP statutes. It is undisputed that the majority approach among the states is that transportation expenses to and from health care providers are reimbursable PIP expenses. *See, e.g.*, 12 *Couch on Insurance* § 171.64 (3d ed) ("Transportation expenses incurred traveling to and from medical providers for treatment of covered injuries arising out of an automobile accident are compensable under a no-fault or Personal Injury Protection (PIP) insurance policy because these transportation costs are incurred in connection with, and are causally related to, reasonable and necessary medical services."); 4 *Automobile Liability Insurance* 4th § 56:1 ("The cost of transportation to and from a doctor's office in order to receive necessary medical treatment is normally a reimbursable medical benefit expense."). However, for the following reasons, those cases do not persuade us that plaintiff's, or the dissent's, interpretation of ORS 742.524(1)(a) is correct.

We address only two of plaintiff's out-of-state cases—*Malu v. Security Nat'l Ins. Co.*, 898 So 2d 69 (Fla 2005), and *Allstate Ins. Co. v. Smith*, 902 P2d 1386 (Colo 1995)—because only those cases involved statutory texts analogous to the text at issue in ORS 742.524(1)(a).[11] But despite the superficial similarity between the PIP statutes construed in *Malu* and *Smith* and in ORS 742.524(1)(a), those two cases are of limited persuasive value, because of the policy and interpretive principles that the courts in those cases applied.

In *Malu*, the Florida PIP statute provided that the following medical expenses were compensable:

---

[11] The other two cases that plaintiff cites, *Plemmons v. New Jersey Auto. Full Ins. Underwriting Ass'n*, 622 A2d 275 (NJ Super Ct App Div 1993), and *Davis v. Citizens Ins. Co. of America*, 489 NW2d 214 (Mich 1992), are not useful, because they involved statutes that, by their express terms, provided broader coverage than does ORS 742.524(1)(a).

> "Eighty percent of *all reasonable expenses for medically necessary medical*, surgical, X-ray, dental, and rehabilitative *services*, including prosthetic devices and medically necessary ambulance, hospital, and nursing services."

Fla Stat § 627.736(1)(a) (2003) (emphases added). The Florida Supreme Court held that the state's PIP statute required an insurer to reimburse transportation costs that an insured incurred in connection with medical treatment that was reasonably medically necessary. *Malu*, 898 So 2d at 76. In doing so, the court underscored that it had previously held that "the PIP statute should be interpreted liberally to effectuate the legislative purpose of providing *broad* PIP coverage for Florida motorists." *Id.* at 74 (emphasis added; citations omitted). And the court determined that "[i]nterpreting the statutory language to include such travel expenses [was] consistent with effectuating this legislative purpose." *Id.*

The court bolstered that determination by highlighting the Florida legislature's tacit consent to the inclusion of transportation expenses in PIP benefits. The court noted that, 17 years before, in *Hunter v. Allstate Insurance Co.*, 498 So 2d 514 (Fla 5th Dist Ct App 1986), a Florida appeals court had "held that medical transportation expenses were reimbursable under the statute." *Id.* at 75. The Florida Supreme Court stressed that the compensability of medical transportation expenses under the PIP statute "ha[d] never been questioned by the Legislature since" that 1986 decision, a fact that led the court to conclude that that the legislature had "tacitly approved" of that construction. *Malu*, 898 So 2d at 75-76.

In *Smith*, the Colorado Supreme Court held that "[m]ileage costs for travel to and from health care providers for treatment of injuries arising from an automobile accident are expenses for medical services that must be paid by the insurer under" the Colorado Auto Accident Reparations Act (Act), Colorado's PIP statute, Colo Rev Stat § 10-4-706(1)(b) (1994) (*repealed by* Laws 1997, HB 97-1209, § 8, eff July 1, 2003). 902 P2d at 1389. That statute provided that an insurer must reimburse the following expenses:

"*all reasonable and necessary expenses for medical*, chiropractic, optometric, podiatric, hospital, nursing, X-ray, dental, surgical, ambulance, and prosthetic *services*, and non-medical remedial care and treatment rendered in accordance with a recognized religious method of healing, performed within five years after the accident for bodily injury arising out of the use or operation of a motor vehicle."

Colo Rev Stat § 10-4-706(1)(b) (emphasis added). The court explained that the "legislative intent and policy behind the Act are to maximize, not minimize[,] insurance coverage \*\*\* and to ensure that persons injured in automobile accidents are fully compensated for their injuries." *Smith*, 902 P2d at 1387.[12] The court also discussed public policy, noting that, "[i]n the modern health care system, travel to and from health care providers is an essential element of medical treatment" and that "the cost of transportation expenses is especially burdensome in the case of rural residents who may have to travel significant distances to obtain medical services." *Id.* at 1388. The court therefore concluded that both the text of the statute and the statute's remedial purpose of maximizing insurance coverage required that travel expenses necessary to obtain medical services be compensable. *Id.* at 1389.

As illustrated by the foregoing discussion, in reaching the conclusion that transportation expenses were reimbursable, the courts in *Malu* and *Smith* relied heavily on the legislative purpose of providing broad or maximum PIP benefits coverage and on public policy. We are satisfied that the statutory schemes in those states—Florida and Colorado—differ from Oregon's PIP statutory scheme.

Although Oregon's PIP statute has similar text, the Oregon PIP statutes do not include a statement dictating that the purpose of the PIP statutes is to provide broad coverage, nor has this court so stated. In fact, our case law recognizes limited, not broad, PIP benefit coverage. In *Perez*, we stated that the PIP statutes were created to provide

---

[12] The Act's legislative declaration provided:

"The general assembly declares that its purpose in enacting this part 7 is *to avoid inadequate compensation* to victims of automobile accidents[.]"

Colo Rev Stat § 10-4-702 (emphasis added).

reimbursement for *some*, not all, out-of-pocket losses result-ing from motor vehicle accidents. *Perez*, 289 Or at 300.

Moreover, it appears that, in at least two ways, Oregon's PIP statute is more limited than the acts in other states. Most of the various state PIP statutes "require an insurer to provide coverage for reasonable and necessary medical expense incurred within a specified period follow-ing the accident." 4 Automobile Liability Insurance 4th § 56:1. The one-year period in the 2007 version of the Oregon PIP statutes is the shortest of the periods specified.[13] *Id.* The longest fixed period appears to be that of the former Colorado act in setting a five-year period; and Florida, along with four other states, does not impose a time limit at all. *Id.* In addition, reimbursement for medical expenses under Oregon's PIP statutes has been subject to a cap of $15,000 since 2003.[14] Therefore, we do not consider *Malu* or *Smith* to be helpful in our interpretation of ORS 742.524(1)(a).

In sum, the legislature did not intend expenses for ordinary transportation to receive medical treatment or to obtain medication to be PIP benefits under ORS 742.524(1)(a). Instead, we conclude that the phrase "expenses of medical * * * services" in that statute requires an insurer to pay for healthcare bills and items that a physician or other health-care provider prescribes for treatment, such as medications and medical supplies and equipment.

The decision of the Court of Appeals and the judg-ment of the circuit court are affirmed.

---

[13] Oregon now has a two-year period. *See* ORS 742.524(1)(a) (2015) (PIP ben-efits consist of "expenses of medical * * * services incurred within two years after the date of the person's injury").

[14] In contrast, the dissent views the existence of the cap on the total PIP benefit as being consistent with an expansive understanding of covered medical benefits that would include transportation costs, observing that including trans-portation costs "would not increase the total benefits" for the injured person given the cap. *Dowell*, 361 Or at ___ (Walters, J., dissenting). Although the total benefit for a covered individual does not increase under the dissent's interpretation of the statute, there can be no question that the total cost of PIP claims would increase. Should the legislature wish to extend PIP benefits to include the cost of travel to obtain medical services, it is free to do so. However, as we view the terms of the statute, insurers are not required to pay for those costs, and we cannot add them to "expenses of medical * * * services" in ORS 742.524(1)(a).

**WALTERS, J.,** dissenting.

If the terms of ORS 742.524(1)(a) (2007) unambiguously precluded payment of transportation expenses, then this court would have no choice but to interpret that statute to deny injured motorists access to necessary medical care. However, as the majority acknowledges, the text of ORS 742.524(1)(a) is not so clearly limited; it can be read to require payment of such expenses. The statute's text requires payment of "[a]ll reasonable and necessary expenses of medical *** services," ORS 742.524(1)(a), and the word "expenses" means "a cost[] to secure a benefit or bring about a result," 361 Or at __. Because transportation costs may be costs incurred to secure the benefit of medical services, the statute's text may be understood to require payment of such costs, and its context and legislative history demonstrate that that is, in fact, what the legislature intended. As context, the legislature has instructed that the statute was enacted for "the protection of the insurance-buying public," ORS 731.008, and that it must be "liberally construed," ORS 731.016. The statute's legislative history indicates that the legislature intended to require insurers to promptly pay their insureds' economic losses to increase insureds' chances for full recovery and to avoid the need for contentious third-party litigation.

Had the majority given effect to the statute's text, context, and legislative history, and followed the lead of all courts that have considered the question, the majority would have interpreted ORS 742.524(1)(a) to require insurers to pay transportation costs. Instead, the majority chooses a unique interpretation of ORS 742.524(1)(a) that requires insurers to pay other costs incurred to secure the benefit of medical services—costs for medication, supplies, and equipment—but not transportation costs. That interpretation departs from law and logic and leaves those who do not have the means to travel to secure necessary medical care without the same chances for full recovery and opportunity to avoid litigation that others have. That is wrong, and I dissent.

I begin by explaining in more detail the reasoning that this court would engage in if it were to follow its

ordinary paradigm and interpret ORS 742.524(1)(a) to require payment of transportation expenses. I then show how far the majority reaches—disregarding the meaning of the word "expenses," relying on an illogical meaning of the word "of," refusing to interpret the statute in accordance with legislative direction, and turning away from the statute's legislative history—to deny insureds the benefit of the insurance policies that they are required to purchase.

If this court were to follow settled law, it would focus, first, on the statute's text and give ORS 742.524(1)(a)[1] its plain meaning. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). ORS 742.524(1)(a) requires payment of "[a]ll" reasonable and necessary "expenses" of medical services. Giving the word "expenses" its ordinary meaning, ORS 742.524(1)(a) requires payment of costs "expended to secure a benefit relating to work that is performed by another, when that work involves the practice of medicine." *Dowell v. Oregon Mutual Ins. Co.*, 268 Or App 672, 677, 343 P3d 283 (2015).[2] Because transportation may be necessary to secure a physician's treatment, transportation costs come within those statutory terms: They are costs expended to secure a medical benefit. The legislature did not intend to cover only some of the reasonable and necessary

---

[1] ORS 742.524(1)(a) requires the insurer to reimburse the insured for

"[a]ll reasonable and necessary expenses of medical, hospital, dental, surgical, ambulance and prosthetic services incurred within one year after the date of the person's injury, but not more than $15,000 in the aggregate for all such expenses of the person."

[2] The Court of Appeals arrived at that meaning by examining the dictionary definitions of the statutory terms:

"'Expense' may be defined as 'something that is expended in order to secure a benefit or bring about a result[.]' *Webster's Third New Int'l Dictionary* 800 (unabridged ed 2002). 'Of' may be defined as 'relating to: with reference to: as regards: ABOUT[.]' *Id.* at 1565 (boldface in original). 'Medical' may be defined as 'of, relating to, or concerned with physicians or with the practice of medicine often as distinguished from surgery[,]' and 'medicine' may be defined as 'the science and art dealing with the maintenance of health, and the prevention, alleviation, or cure of disease[.]' *Id.* at 1402. 'Service' may be defined as 'the performance of work commanded or paid for by another[.]' *Id.* at 2075. Thus, the plain meaning of 'expenses of medical *** services' may be construed as something that is expended to secure a benefit relating to work that is performed by another, when that work involves the practice of medicine (the maintenance of health, and the prevention, alleviation, or cure of disease)."

*Dowell*, 268 Or App at 676-77 (brackets in original).

costs expended to secure medical benefits; it intended to cover "[a]ll" such costs. ORS 742.524(1)(a).

Having given the statute's text its ordinary meaning, this court then would turn, for context, to other statutes that, like ORS 742.524(1)(a), are part of the Insurance Code. *See Northwest Natural Gas Co. v. City of Gresham*, 359 Or 309, 322, 374 P3d 829 (2016) (quoting *PGE*, 317 Or at 611) ("The context of the statute includes 'other provisions of the same statute and other related statutes.'"). ORS 731.008 provides that "the Insurance Code is for the protection of the insurance-buying public," and ORS 731.016 provides that the Insurance Code "shall be liberally construed."

Oregon law requires that all drivers obtain liability insurance and purchase first-party PIP insurance. ORS 806.080. Therefore, drivers who pay premiums for that insurance are members of the insurance-buying public. Drivers who suffer injuries may have to travel long distances to obtain specialized care. In most respects, Oregon is a rural state, and Portland is a hub for specialized medical care. *See Horton v. OHSU*, 359 Or 168, 171, 376 P3d 998 (2016) (pediatric surgery specialist performed operation to remove mass on plaintiff's liver); *Ackerman v. OHSU Medical Group*, 233 Or App 511, 514, 227 P3d 744 (2010) (plaintiff underwent surgery at OHSU to repair injured disc in neck); *Clarke v. OHSU*, 343 Or 581, 586, 175 P3d 418, 421 (2007) (plaintiff underwent surgery at OHSU to repair congenital heart defect). Giving effect to the statute's context and following the legislature's instructions, this court would construe ORS 742.524(1)(a) liberally, so that those who pay PIP premiums and who need specialized care receive payment for *all* reasonable and necessary costs that they incur to secure medical services, including transportation costs. This court followed exactly that method of analysis in *Gearhart v. PUC*, 356 Or 216, 244, 339 P3d 904 (2014) (reading related statutes together and following legislature's direction that laws administered by Public Utility Commission should be "liberally construed"), and *State v. Walker*, 356 Or 4, 17, 333 P3d 316 (2014) (considering instruction that ORICO statutes "shall by liberally construed" in its construction of those statutes).

        Having considered relevant statutory context, this court also would look to the legislative history of ORS 742.524(1)(a) and would find that it supports an interpretation of the statute that requires payment of transportation costs incurred to secure medical services. The legislative history indicates that the legislature required drivers to purchase first-party PIP insurance to provide speedy payment of economic losses to increase injured persons' chances of recovery and to reduce third-party litigation. In a portion of that legislative history that the majority quotes, but only selectively, *Dowell*, 361 Or at __, Commissioner Bateson explained that there was a need for first-party insurance because

> "speed of payment of a claim is often as important as whether or not it is paid at all. Prolonged adjustment procedures during which the injured party is without wages or wage replacement, during which hospital, doctor or repair bills go unpaid and during which needed rehabilitation is delayed, *frequently damage the claimant's* family, his credit rating and his *chance for full recovery.* Delay in settlement may also engender in the claimant an attitude toward the insurer which will be uncooperative, even vengeful, and may lead to a larger ultimate claim or settlement than would have been the case if prompt payment were made.

Exhibit E, Subcommittee on Financial Affairs, House State and Federal Affairs Committee, HB 1300, Feb 24, 1971 (accompanying statement of Insurance Commissioner Cornelius Bateson) (emphases added). Commissioner Bateson further explained

> "[t]hat, despite the uninsured motorists coverage which is required in every auto liability insurance policy issued in Oregon, there are still many people whose coverage for *economic loss* sustained in auto accidents is less than adequate."

*Id.* (emphasis added).

        If this court were following settled principles of statutory construction, the court would interpret ORS 742.524(1)(a) to have a meaning consistent with the legislature's articulated purposes. *See State v. Johnson*, 339 Or 69, 81 n 7, 116 P3d 879 (2005) (discerning legislature's "clear

overall purpose in enacting" the statute). In Commissioner Bateson's words, paying an injured person's *economic loss* would increase the person's *chance for full recovery* and reduce the need for third-party litigation. To the contrary, precluding payment of transportation expenses would defeat the legislature's purposes. If an injured person did not have the means to travel for specialized care, not only would bills go unpaid, the person would not receive necessary treatment, reducing the person's chances for full recovery. And, even if the injured person did have the means to travel, the only way that the person could recover transportation expenses would be to bring a third-party action, defeating the legislature's purpose of avoiding the need for such litigation. The legislature's purposes explain why it chose to require payment of "*[a]ll*" reasonable and necessary "expenses of medical *** services." ORS 742.524(1)(a) (emphasis added).

Finally, if this court were to follow settled law, it also would look to the reasoning of other courts for guidance. *See, e.g.*, *Priest v. Pearce*, 314 Or 411, 419, 840 P2d 65 (1992) (looking to decisions of other state courts interpreting parallel constitutional provisions for guidance). In doing so, this court would find that all of the courts that have considered the matter have interpreted their PIP statutes to require payment of transportation costs. *See* Anderson *et al*, 12 *Couch on Insurance* § 171.64 (3d ed 1984) ("Transportation expenses incurred traveling to and from medical providers for treatment of covered injuries arising out of an automobile accident are compensable under a no-fault or Personal Injury Protection (PIP) insurance policy[,] because these transportation costs are incurred in connection with, and are causally related to, reasonable and necessary medical services."); Arthur Larson & Lex K. Larson, 5 *Larson's Workers' Compensation Law* § 94.03, 94-98 (2012) ("Transportation costs necessarily incurred in connection with medical treatment are compensable, even if the act speaks only of medical and hospital services.").

For instance, in *Malu v. Security Nat'l Ins. Co.*, 898 So 2d 69 (Fla 2005), the Florida Supreme Court held that its similarly worded PIP statute required payment of

transportation expenses.[3] That court previously had held that "the language of the PIP statute should be interpreted liberally to effectuate the legislative purpose of providing broad PIP coverage for Florida motorists." *Id*. at 76 (citations omitted). In *Malu*, the court determined that "[i]nterpreting the statutory language to include such travel expenses [was] consistent with effectuating this legislative purpose." *Id*.; *see also Allstate Ins. Co. v. Smith*, 902 P2d 1386 (Colo 1995) (relying on remedial purpose of statute in favor of insured motorists).

Had the majority been guided by that legal authority, it, too, would have required payment of transportation expenses necessarily incurred in connection with medical treatment. Instead, however, the majority reads the phrase "expenses of medical \*\*\* services," ORS 742.524(1)(a), to require an insurer to pay the cost of medication, supplies, and equipment that healthcare providers prescribe, but not the cost of transportation. *Dowell*, 361 Or at \_\_. As I will explain, that conclusion does not follow from the statute's text, context, or legislative history.

The majority begins, as it must, with the statute's text and correctly recognizes that the word "expense" means "something that is expended, a cost, to secure a benefit or bring about a result." *Id*. at \_\_. However, instead of grappling with the fact that transportation can be "a cost[] to secure a benefit or bring about a result"—medical care—the majority interprets the phrase "expenses of medical \*\*\* services" to mean "costs that originate with or that are actuated by the rendered medical treatment or the physician's performance of work." *Id*. at \_\_. The majority then reasons that costs for items such as medication, supplies, and equipment qualify, but costs for transportation do not. *Id*. at \_\_.

In arriving at its interpretation of the phrase "expenses of medical \*\*\* services," the majority commits

---

[3] The Florida statute provided that the following medical expenses were compensable:

"Eighty percent of *all reasonable expenses for medically necessary medical*, surgical, X-ray, dental, and rehabilitative *services*, including prosthetic devices, and medically necessary ambulance, hospital, and nursing services."

Fla Stat § 627.736(1)(a) (2003) (emphases added).

two errors. The majority's first error is in defining the word "expenses" to mean "a cost[] to secure a benefit" but then reading that word and its meaning out of its interpretation of the phrase. That error violates the tenet of statutory construction that requires that the court give meaning to all the words that the legislature uses. *See* ORS 174.010 ("[W]here there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."); *see also Force v. Dept. of Rev.*, 350 Or 179, 190, 252 P3d 306 (2011) ("Statutory provisions, however, must be construed, if possible, in a manner that 'will give effect to all' of them.").

The majority's second error is in transferring its focus to the meaning of the word "of" and the definition that it ascribes to that word. Instead of giving the word "of" the meaning adopted by the parties and the Court of Appeals—"relating to"—the majority selects other dictionary definitions to conclude that it means "originate with" or "actuated by." *Dowell*, 361 Or at __. The majority first says that "of" means "*from* as the place of birth, production, or distribution: having as its base of operation, point of initiation, or source of issuance or derivation," *id.* at __ (emphasis added), as used in the phrase "[of] or relating to Italy," *Webster's Third Int'l Dictionary* 1565 (unabridged ed 2002). Then, the majority says, even if that locational meaning is not correct, the word "of" also can have two alternative meanings: It can be used as a function word to (1) "indicate the cause, motive, or reason by which a person or thing is actuated or impelled," as in the phrase "die [of] shame"; or (2) "indicate a quality or possession characterizing or distinguishing a subject," as in the phrase "men [of] goodwill." *Id.* at 1565; 361 Or at __. The majority then selects words from the locational meaning of the word "of" and one of the alternative definitions that it suggests and decides that the word "of" means "originate with" or "actuated by." 361 Or at __. Thus, the majority interprets the phrase "expenses of medical * * * services" to mean costs that "originate with" or are "actuated by" medical services. *Id.*

The meaning that the majority gives to the word "of" cannot be the meaning that the legislature intended. First, the legislature used the word "of" in conjunction with the preceding word "expenses," which, as the majority recognizes,

means costs *to secure* a benefit. *Id*. at __. Therefore, the legislature must have used the word "of" to describe the nature of the costs that an insured incurs *to secure* insurance benefits: Those costs not only must be costs incurred to secure some benefit; they must be costs to secure the benefit of the listed medical services. That understanding of the meaning of the word "of" is consistent with the definition that the parties and the Court of Appeals deem appropriate—"related to"—and with the second alternative definition that the majority posits—that the costs that an insured incurs must have qualities that distinguish them from other costs. In other words, the costs "of" services must be costs related to the listed services or incurred to secure the listed services. In contrast, however, the legislature could not have intended the word "of" to have the meaning ascribed by the majority. The legislature knew that the reason that a motorist incurs costs is that the motorist has suffered injuries in a motor vehicle accident; the motorist's motive for incurring costs is to obtain treatment of those injuries, and those injuries are the originating source of the costs. The legislature did not use the word "of" as a function word to refer to the motive that impels an insured to incur costs.

Second, the legislature expressly required payment of at least one listed expense that does not "originate with" and that is not "actuated by" medical services. ORS 742.524(1)(a) requires payment of expenses of "ambulance" services, and such expenses precede and do not "originate with" medical treatment. Ambulance costs also are not "actuated by" medical treatment. If the legislature had intended the word "of" to mean "originat[ing] with" or "actuated by" medical treatment, that intent would be at odds with its requirement that insurers compensate insureds for ambulance expenses.

Third, the conclusion that the legislature did not use "of" to mean "originate with" or "actuated by" is clear from the fact that the legislature used the word "of" interchangeably with the word "for"; the word "for" does not have those meanings. As originally enacted, ORS 742.524(1)(a) used the word "for" rather than "of" in the phrase "reasonable and necessary expenses for" medical services. Or Laws 1971, ch 523, § 2. As the majority recognizes, that change

in use "does not appear to have been intended as meaning-
ful." *Dowell*, 361 Or at __. The word "for" is defined to mean,
among other things, "as regards: in respect to: concerning."
*Webster's* 886. It also is defined to mean "so as to secure a
result." *Id*. It is not defined to mean "originate with" or "actu-
ated by." To have used the words "of" and "for" interchange-
ably, the legislature must have understood those words to
have a common meaning, and that common meaning can
only be "relating to" or "to secure a result."[4]

      Fourth, even if the word "of" could be used to mean
"originate with," or "actuated by," the statute would require
payment of transportation costs when a physician directs an
injured person to obtain specialized care at a distant loca-
tion. When the majority interprets the word "of" to include
costs "prescribed" by a physician, such as medications, but
not to include transportation costs, presumably because they
are not "prescribed," the majority adds a requirement that
the statute does not include and violates another tenet of
statutory construction. *See* ORS 174.010 ("In the construc-
tion of a statute, the office of the judge is simply to ascer-
tain and declare what is, in terms or in substance, contained
therein, not to insert what has been omitted, or to omit what
has been inserted[.]").

      When the majority turns to statutory context to
determine whether it supports the textual meaning that the
majority posits, the majority again commits error. As noted,
the legislature directs that "the Insurance Code is for the
protection of the insurance-buying public," ORS 731.008,
and "shall be liberally construed," ORS 731.016. Although
the majority agrees that those statutes function as con-
text for its interpretation of ORS 742.524(1)(a), it refuses
to "employ" them. *Dowell*, 361 Or at __. That is not what
this court has done in the past. For instance, in *Walker*, a
case that this court decided in 2014, this court applied the
legislative instruction that the ORICO statutes "shall by

---

[4] The majority argues, in a footnote, that "for" can also mean "because of" or
"on account of," and that that meaning is consistent with the meaning that the
majority ascribes. *Dowell*, 361 Or at __. But an injured motorist incurs costs to
secure a benefit because of or on account of the motorist's injuries, not because of
or on account of "medical services."

liberally construed" in its analysis of the statute's text and context. 356 Or at 17.

The majority does not explain its departure from *Walker*. Instead, the majority addresses plaintiff's argument that a 1997 case, *Carrigan v. State Farm Mutual Auto. Ins. Co.*, 326 Or 97, 104, 949 P2d 705 (1997), requires liberal construction of the PIP statutes. The majority observes that, in *Carrigan*, the court considered the legislature's instruction only after it had considered the text, context, and legislative history of the statute at issue and found that the statute's meaning remained unclear. *Dowell*, 361 Or at __. Perhaps that was what the court did in *Carrigan* in 1997, but that was not what the court did in *Walker* in 2014. Moreover, *Carrigan* does not justify refusing to give the legislature's instruction any consideration at all.

In this case, the majority not only fails to give effect to ORS 731.016 and ORS 731.008 as statutory context, it compounds its error by refusing to consider those statutes at any point in its analysis. If the majority intends to claim that the text, context, and legislative history of ORS 742.524(1)(a) so clearly compel a result that it can disregard the legislature's interpretive direction, then it should explicitly stake out that claim.

The majority does not do so. Instead, the majority acknowledges that the text of the statute can be read in at least three different ways, *id*. at __, and says that its context does no more than indicate "a problem" with plaintiff's reading of the statute, *id*. at __.

Significantly, the majority does not draw support for its own unique interpretation of the statute from the statutory context on which it relies, nor could it. The "problem" that the majority identifies is that ORS 742.524(1)(a) mentions one kind of transportation expense (ambulance services) but not others, a reference that the majority claims casts doubt on plaintiff's interpretation. *Id*. That "problem" would, however, present the same difficulty for the majority's interpretation as it does for plaintiff's. For instance, the statute mentions one type of medical service provider who provides one type of medical equipment—prosthetic service providers who provide prosthetic devices—but not other

types of medical service providers who provide other items, such as pharmacists who provide medication. The statute also specifically mentions certain service providers—medical, surgical, and dental service providers—but does not mention other service providers—pharmacists, nurses, or optometrists.[5] Applying the majority's logic, reference to certain specific service providers and the items that they provide would exclude payment for others. For instance, payment for both pharmacists and the medications that they provide would be excluded.

The majority does not, and cannot, claim that the statute's context demonstrates, unambiguously, that its interpretation of ORS 742.524(1)(a) is the correct one. In fact, looking more closely at the "problem" to which the majority points demonstrates that the legislature intended to impose a general requirement that insurers pay all reasonable and necessary costs to secure what are generally thought of as medical services and also specifically listed some services that it considered medical in nature—surgical and dental services, for example—to make clear the breadth of its reference. In doing so, the legislature did not intend to exclude other services, such as pharmaceutical, nursing, or optometry services, or the costs necessary to secure the benefit of those services.

Turning to legislative history, the majority observes that the legislature *did not discuss* transportation expenses and reasons that that "*does not indicate* that the legislature was concerned with delayed payments to injured motorists for their transportation costs to receive medical care." *Id*. at __ (emphasis added). The majority cannot say what that silence *does indicate* because it knows full well that legislative silence is an unreliable indicator of legislative intent. *See State v. Rainoldi*, 351 Or 486, 492, 268 P3d 568 (2011) (noting that, because fact of legislative silence can give rise to competing inferences, it is generally not a dispositive indicator of intent).

The majority nevertheless concludes that "the legislative history *is consistent with* our reading of the phrase

---

[5]  *See* ORS 677.060(7) (excluding pharmacy, nursing, and optometry services, among others, from regulation of medicine).

'expenses of medical \*\*\* services' in ORS 742.524(1)(a) as including (1) the cost of professional services provided by licensed or certified healthcare providers and (2) medications and medical supplies and equipment that they have prescribed for the injured motorists that they treat." *Dowell*, 361 Or at __ (emphasis added). How can that be so? The legislative history fails to include a discussion of the costs of medications, medical equipment, and the services of pharmacists and nurses. If legislative silence *does not indicate* that the legislature was concerned with payment of transportation expenses, it also *does not indicate* that the legislature was concerned with payment of the costs of medications, medical equipment, or the services of pharmacists or nurses.

The majority also makes reference to the legislature's discussion of the cost of PIP benefits, but it is wrong to conclude that the legislature worded ORS 742.524(1)(a) as it did to limit payment of costs necessary to secure medical treatment. The legislative history demonstrates that the costs of providing payment for "[a]ll" reasonable and necessary "expenses for medical \*\*\* services" were known to the legislature and did not concern it. Many companies already were selling, and drivers already were purchasing, first-party insurance to cover medical expenses; the significant added benefit in the PIP statutes was coverage for wage loss.[6] Furthermore, the method that the legislature chose to

---

[6] In 1971, when the legislation at issue in this case was first enacted, Oregon drivers were not required to have liability insurance to ensure that they would be financially responsible for damages caused by their careless driving. Exhibit E, Subcommittee on Financial Affairs, House State and Federal Affairs Committee, HB 1300, Feb 24, 1971 (accompanying statement of Insurance Commissioner Cornelius Bateson). However, the 1971 legislative history indicates that many drivers nevertheless obtained liability insurance and had some coverage that protected them even if a third party was not at fault or was not financially responsible. *Id*. Oregon law required that liability insurance policies include coverage for damages caused by uninsured motorists, and the majority of policies issued in Oregon contained some form of "med-pay" coverage—payment of an insured's medical expenses without regard to fault. *Id*. Few policies, if any, contained coverage for wage loss. *Id*. That was not satisfactory, in the eyes of the Insurance Commissioner, Cornelius Bateson. He told the legislature that the system "by which people protect themselves against financial loss due to auto accidents" was far from perfect, and, nationally, "[had] been subjected to close scrutiny and substantial criticism." Subcommittee on Financial Affairs, House State and Federal Affairs Committee, Feb 24, 1971 (statement of Insurance Commissioner Cornelius Bateson).

contain medical costs was to require that they be reasonable and necessary, and to impose both monetary and durational caps. ORS 742.524(1)(a)-(e). An insurer is required to pay no more than $15,000 for aggregate medical expenses incurred within one year[7] after the date of the person's injury.[8] ORS 742.524(1)(a). Interpreting that statute to require payment of an injured person's transportation expenses would not increase the total benefits for which that person would be eligible.

Furthermore, if a concern with cost were to indicate an intent to preclude payment of transportation expenses, it would also indicate an intent to preclude payment for medication. The cost of medication is significant. *See* Centers for Disease Control and Prevention, *Health Expenditures*, http://www.cdc.gov/nchs/fastats/health-expenditures.htm (Oct 7, 2016) (accessed Feb 14, 2017) (prescription drugs accounted for 9.8 percent of total United States health expenditures in 2014—$294 billion).

The majority does not claim or demonstrate that the text, context, and legislative history of ORS 742.524(1)(a) unambiguously demonstrate that it must be interpreted as the majority reasons—to require an insurer "to pay for healthcare bills and items that a physician or other healthcare provider prescribes for treatment, such as medications and medical supplies and equipment." *Dowell*, 361 Or at __. Therefore, even if only at the last step of its analysis, the majority should have returned to the legislature's direction to interpret ORS 742.524(1)(a) liberally for the benefit of the insurance-buying public. Had it done so, the majority would have interpreted that statute to cover not only the cost of

---

In response to questions about increased premiums under the new law, Commissioner Bateson replied that the cost of coverage from a substandard insurance company insuring a high risk youthful driver with a "hot rod" car was estimated to be an additional premium of $18 per year, while the cost for a driver with a good record would probably not exceed an additional $14 or $15 per year. Tape Recording, Senate Judiciary Committee, HB 1300, May 19, 1971, Tape 10, Side 2. Mr. Bateson also said that one company was selling coverage slightly more beneficial than the bill required for an additional premium of $7 per year. *Id*.

[7] The current version of the ORS 742.524(1)(a) (2015) provides that PIP benefits consist of "expenses of medical *** services incurred within two years after the date of the person's injury."

[8] Originally, PIP benefits were capped at $3,000. Or Laws 1971, ch 523, § 2.

"prescribed" medication and equipment, but also to cover "[a]ll" reasonable and necessary costs to secure the benefit of medical treatment, including transportation costs.

The majority's failure to give ORS 742.524(1)(a) an interpretation that its words permit, that accords with legislative direction, and that fulfills its purposes may not be without remedy. Perhaps those in need will be able to seek, and caring physicians will take the time to write, prescriptions for transportation to secure specialized medical care. After all, there is no conceptual difference between a physician's direction to obtain medication and a physician's direction to obtain transportation. Or, perhaps, the legislature will take time from other pressing matters to expressly instruct insurers that "expenses of medical *** services" include the reasonable and necessary costs of transportation to procure those services. ORS 742.524(1)(a).

But even if a remedy exists, the majority's failure sounds an alarm of injustice that extends beyond this case. The majority's conclusion that those without access to medical care must forego it or wait the time and bear the uncertainty that litigation entails and that PIP benefits were designed to avoid is not legally correct, and the means that the majority adopts to justify that end deviate from our legal norms. I dissent.

Baldwin and Brewer, JJ,. join in this dissenting opinion.